**IN THE UNITED STATES DISTRICK COURT**
**FOR THE SOUTHER DISTRICT OF FLORIDA**

MILA MIAMI, LLC,

                Plaintiff,

    vs.

RLI INSURANCE COMPANY, dba MT.
HAWLEY INSURANCE COMPANY

and

CERTAIN UNDERWRITERS AT LLOYD'S
OF LONDON KNOWN AS RENAISSANCE
RE SYNDICATE 1458 LLOYD'S,

              Defendant.

Case No.  1:20-cv-25339

**JURY TRIAL DEMANDED**

_____

## COMPLAINT

    Plaintiff, MILA MIAMI, LLC aka MILA FLORIDA, LLC ("MILA"), individually and on behalf of all others similarly situated, brings this class action against Defendants, MT. HAWLEY INSURANCE COMPANY dba MT. HAWLEY INSURANCE COMPANY ("MT. HAWLEY") and RENAISSANCE RE SYNDICATE 1458 LLOYD'S ("LLOYD'S"), and in support thereof states and alleges the following:

## PARTIES, JURISDICTION AND VENUE

    1.    Plaintiff MILA is a Delaware limited liability company lawfully authorized to conduct business within the State of Florida with its principal place of business located at 800 Lincoln Rd., Miami Beach, Florida.

    2.    Defendant MT. HAWLEY Is an Illinois corporation having its principal place of business at 9025 North Lindbergh Drive, Peoria, Illinois 60615.

3.       Defendant LLOYD'S is, upon information and belief, an insurance underwriter formed and subsisting under the laws of the United Kingdom, having its headquarters in Pembroke, Bermuda and a principal place of business at 1 Lime Street, London, EC3M 7HA, United Kingdom.

4.       This Court has subject-matter jurisdiction of this class action pursuant to 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy, the aggregated claims of the members of the proposed class ("Class"), exceeds the sum of five million dollars, exclusive of interest and costs, and Plaintiff, a member of the proposed Class, is a citizen of a state different from Mt. Hawley and Lloyd's, pursuant to 28 U.S.C. § 1332(d)(4)(A)(II)(cc), in that the Defendants are not citizens of the state in which this action has been filed, and, pursuant to 28 U.S.C. § 1332(d)(5), in that the proposed Class has more than 100 members.

5.       Jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.       Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) in that the Defendants are deemed to reside in this judicial District pursuant to 28 U.S.C. § 1391(d). Defendants have purposefully conducted and continue to purposefully conduct substantial business in this judicial District.

7.       Venue is also proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, and a substantial part of the property that is the subject of this action is situated within, this judicial District.

## INTRODUCTION

8.      Plaintiff is an upscale restaurant located at 800 Lincoln Road, Miami Beach, Florida ("Restaurant").

9.      Plaintiff's founders chose the location for the Restaurant on the famous Lincoln Road in Miami Beach due to Lincoln Road's acclaim for fine dining and shopping, as well as the enormous amount of foot traffic which it receives throughout the year.

10.      Plaintiff's founders meticulously designed and constructed the Restaurant to meet their exacting specifications prior to opening.

11.      Plaintiff also purchased insurance coverage from Defendants, including property coverage, to protect its business in the event that it suddenly had to suspend operations for reasons outside of its control, and/or in order to prevent further property damage.

12.      The insurance coverage which Plaintiff purchased from Defendants is in the form of an all-risks commercial property policy with 90% covered by Defendant Mt. Hawley and 10% covered by Defendant Lloyd's.

13.      Specifically, Plaintiff purchased Policy Number MPC0602157 having a policy period from 01/08/2020 through 01/08/2021 (the "Policy").

14.      The Policy insures against all risks of direct physical loss. A copy of the Policy is attached hereto as Exhibit A.

15.      The Policy contains the following coverage forms: Building and Personal Property Coverage Form CP-0010(06/07) (Exh. A, at pg. 11), Business Income (and Extra Expense) Coverage Form CP-0030(06/07) (Exh. A, at pg. 26), and Causes of Loss-Special Form CP-1030(06/07) (Exh. A, at pg. 36).

16.     The Policy provides $3,000,000.00 in business income and rental value benefits.

Exh. A, Specified Limits Endorsement CPR 2162 (01/02) (Exh. A, at pg. 8).

17.     The policy does not include an exclusion for the closure of Plaintiff's business

based on the risk of virus proliferation.

18.     The Building and Personal Property Coverage Form in the Policy provides as

follows:

> **A. Coverage**
>
> We will pay for direct physical loss of or damage to Covered Property at
> the premises described in the Declarations caused by or resulting from
> any Covered Cause of Loss.

Exh. A, Coverage Form CP-0010(06/07), at pg. 11.

19.     The Business Income and Extra Expense Coverage Form provides:

> **A. Coverage**
>
> **1. Business Income**
>
> We will pay for the actual loss of Business Income you sustain due to
> the necessary "suspension" of your "operations" during the "period of
> restoration". The "suspension" must be caused by direct physical loss
> of or damage to property at premises which are described in the
> Declarations and for which a Business Income Limit of Insurance is
> shown in the Declarations. The loss or damage must be caused by or
> result from a Covered Cause of Loss. With respect to loss of or damage
> to personal property in the open or personal property in a vehicle, the
> described premises include the area within 100 feet of the site at which
> the described premises are located.

Exh. A, at page 26, Coverage Form CP-0030(06/07).

20.     Plaintiff purchased Extra Expense coverage in the Policy, which is:

> **2.     Extra Expense**
>
> . . . .
>
> > b. Extra Expense means necessary expenses you incur during
> > the "period of restoration" that you would not have
> > incurred if there had been no direct physical loss or

> damage to property caused by or resulting from a Covered
> Cause of Loss.

Exh. A, at page 26, Coverage Form CP-0030(06/07).

21.     The Policy also provides "Additional Coverages" in the form of "Civil Authority"

coverage and "Extended Business Income" coverage.

22.     The Civil Authority coverage clause reads as follows:

> **5. Additional Coverages**
>
> > **a. Civil Authority**
> >
> > . . . .
> >
> > When a Covered Cause of Loss causes damage to property
> > other than property at the described premises, we will pay for
> > the actual loss of Business Income you sustain and necessary
> > Extra Expense caused by action of civil authority that
> > prohibits access to the described premises, provided that both
> > of the following apply:
> >
> > > (1) Access to the area immediately surrounding the damaged
> > >     property is prohibited by civil authority as a result of the
> > >     damage, and the described premises are within that area
> > >     but are not more than one mile from the damaged
> > >     property; and
> > >
> > > (2) The action of civil authority is taken in response to
> > >     dangerous physical conditions resulting from the
> > >     damage or continuation of the Covered Cause of Loss
> > >     that caused the damage, or the action is taken to enable
> > >     a civil authority to have unimpeded access to the
> > >     damaged property.

Exh. A, at page 27, Coverage Form CP-0030(06/07).

23.     The "Extended Business Income" coverage clause reads as follows:

> **c. Extended Business Income**
>
> > **(1)     Business Income Other Than "Rental Value"**
> >
> > > If the necessary "suspension" of your "operations"
> > > produces a Business Income loss payable under this

5

policy, we will pay for the actual loss of Business Income you incur during the period that:

> **(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

> **(b)** Ends on the earlier of:

>> **(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

>> **(ii)** 30 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

Exh. A, at pg. 28, Coverage Form CP 00 30 06 07.

24.     The Policy defines "Covered Cause of Loss" as:

**A. Covered Causes of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

**1.** Excluded in Section B., Exclusions; or

**2.** Limited in Section C., Limitations;

that follow.

Exh. A, at pg. 36, Coverage Form CP-1030(06/07).

25.    "Special" is shown in the Declarations.

26.    The Policy further provides:

> **B.    Exclusions**
>
> . . . .
>
> **2.**    We will not pay for loss or damage caused by or resulting from any of the following . . . .
>
> **b.** Delay, loss of use or loss of market.
>
> . . . .
>
> **3.**    We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> . . . .
>
> **b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

Exh. A, at pg. 38, Form CP-1030(06/07).

27.    The Policy also contains a $500,000 special "Ordinance or Law Coverage" endorsement as follows:

> **Coverage**
>
> The Coverage(s) provided by this endorsement applies only if both **A.1.** and **A.2.** are satisfied and are then subject to the qualifications set forth in **A.3.**
>
> a.   The ordinance or law:
>
> i.   Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements.
>
> ii.   Is in force at the time of loss.
>
> But coverage under this endorsement applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

    b.   a.   The building sustains direct physical damage that is covered under this policy and as a direct result of such covered damage, you are required to comply with the ordinance or law; or

           b.   The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and as a direct result of the building damage in its entirety, you are required to comply with the ordinance of law.

           c.   But if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this endorsement even if the building has also sustained covered direct physical damage.

    c.   In the situation described in **A.2.b.** above, we will not pay the full amount of loss otherwise payable under the terms of Coverages **A**, **B** and/or **C** of this endorsement. Instead, we will pay a proportion of such loss, meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

        However, if the covered direct physical damage, alone, would have resulted in a requirement to comply with the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverages, **A**, **B** and/or **C** of this endorsement.

We will not pay under Coverage **A**, **B** or **C** of this endorsement for:

1. Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

2. The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

    Exh. A, at page 70, Coverage Form CP-1030(06/07), p. 1.

    28.    The Ordinance or Law Coverage endorsement supersedes a purported "Ordinance or Law" *exclusion* set forth on page 36 of the Policy ("Ordinance or Law Exclusion").

29.     Notwithstanding, Mt. Hawley, in a letter dated April 28, 2020 rejecting Mila's claim for coverage under the Policy, cited the Ordinance or Law Exclusion, not the Ordinance or Law Endorsement, in refusing coverage.

30.     The Policy further contains the following additional endorsement:

### ABSOLUTE POLLUTION EXCLUSION ENDORSEMENT

This endorsement replaces any existing terms and/or exclusions regarding pollution liability within this policy.

We will not pay for loss, damage, cost or expense caused directly or indirectly by any of the following. Such loss, damage, cost or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

**A.** Property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants," or contaminants;

   **1.** At or from premises owned, leased, rented or occupied by you,

   **2.** At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste,

   **3.** Which are at any time transported, handled, stored, treated, disposed of or processed as waste by or for you or a person or organization for whom you may be legally responsible, or,

   **4.** At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations;

   **a.** If the "pollutants" are brought on or to the site or location in connection with such operations, or

   **b.** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the "pollutants."

**B**. Any loss, damage, cost or expense arising out of any governmental direction or request that you test for, monitor, clean up, treat, remove, detoxify or neutralize "pollutants" or in any way respond to or assess the effects of "pollutants."

This includes loss or damage caused by or resulting from contributing to or made worse by actual, alleged or threatened release, discharge, escape or

dispersal of contaminants and/or pollutants, all of which direct or indirect, proximate or remote, or in whole or in part, caused by, contributed to, or aggravated by any damage insured by the policy.

**"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. In addition to "pollutants" to be disposed of, waste also includes materials to be recycled, reconditioned or reclaimed. It also includes any material which after its release, dispersal or discharge, can cause or threaten damage to human health and/or human welfare, or causes or threatens damage, deteriorations, loss of value, marketability and/or loss of use, to insured property; including, but not limited to bacteria, fungi, virus, or hazardous substances as listed in the Federal Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976 and/or Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency.

## FACTUAL BACKGROUND

31.     Plaintiff opened its doors for business on January 24, 2020.

32.     The in-person dining facility at the Restaurant is approx. 4,000 ft$^2$.

33.     Plaintiff leases the space in which the Restaurant operates at a rate in excess of $80,000 per month.

34.     Plaintiff was forced to close its operations on March 16, 2020 due to COVID-19 and the ensuing orders issued by civil authorities in Miami-Dade County Florida and the State of Florida.

35.     Plaintiff's director of operations (the "Director"), who is a member of Plaintiff and who worked to design, construct, prepare for the opening of, open and operate the Restaurant, worked seven (7) days per week at the Restaurant from the grand opening of the Restaurant on January 24, 2020 until it was closed on March 16, 2020 due to COVID-19.

36.     During the period that the Restaurant was fully operational from January 24, 2020 to March 17, 2020, the Director would typically work from 9:30 AM - 10:30 PM at the Restaurant; during this time, he ate most of his meals at the Restaurant.

37.     The Director was single during that time, and, because business was very strong from the first day the Restaurant opened, the Director did not socialize outside of the Restaurant due to his heavy workload and commitment to running the Restaurant.

38.     The Director spent nearly all of his waking hours at the Restaurant during the time frame from January 24, 2020 through March 17, 2020.

39.     The Director conducted a daily management meeting at approx. 4:00 PM seven days per week. At the management meetings, those in attendance (usually 5 to 7 employees) sat at the same table, in the same chairs, in close proximity to each other.

40.      The Director woke up on the morning of March 17, 2020 experiencing a dry cough and fever. He went to a doctor that day for treatment, and was tested for COVID-19.

41.     Later that week the Director was informed that the results of the test indicated he was infected with COVID-19.

42.     The Director suffered from a dry cough, fever and other symptoms of being infected with COVID-19 for 16 days.

43.     It is highly probable that the Director contracted COVID-19 while working at the Restaurant, was infected with COVID-19 while working at the Restaurant, and spread COVID-19 to co-employees and customers while working at the Restaurant.

44.     It is probable that COVID-19 was present in, and on surfaces throughout, Plaintiff's Restaurant before and after March 17, 2020.

45.     It is probable that COVID-19 caused a direct physical loss of property at Plaintiff's Restaurant.

46.     It is probable that COVID-19 caused direct physical damage to property at Plaintiff's Restaurant.

47.     The Restaurant was unfit for occupancy due to COVID-19 when it was shut down in March 2020.

48.     Plaintiff suffered direct physical loss of insured property due to the inability to use the restaurant for its intended purpose.

49.     Plaintiff's insured property suffered direct physical damage by COVID-19 being present in, and on surfaces within, the Restaurant.

50.     Plaintiff voluntarily shut down the Restaurant to avoid further damage being done to insured property.

51.     Plaintiff voluntarily shut down the Restaurant to avoid contaminating patrons with COVID-19.

52.     Plaintiff voluntarily shut down the Restaurant to avoid the spread of COVID-19 from patrons to employees of the Restaurant, and vice versa.

53.     A second employee of Plaintiff, who was working up until the Restaurant was closed on March 17, 2020, also tested positive for COVID-19 at that time as well.

54.     The second employee was present at the daily management meetings run by the Director.

55.     Plaintiff did not continue to offer take-out and delivery after the March 20, 2020 Order (defined *infra*) because it would have cost Plaintiff more to do so than to stay closed altogether.

56.     The Coronavirus pandemic has had a widespread and devastating effect on society.

57.     Plaintiff was forced to cease operations – through no fault of its own – by orders of the Federal government and the State of Florida and local government authorities as part of the

governments' efforts to slow the spread of COVID-19 and consequent personal and property damage.

58.    Plaintiff has incurred expenses in connection with reconfiguring the Restaurant to accommodate the reduced-capacity limitations imposed by government orders.

59.    To protect its business from hazards like the Coronavirus pandemic, which threatens the livelihoods of the owners and employees and is based on factors outside of its control, Plaintiff purchased a property insurance policy from Defendants that includes business interruption insurance.

60.    On March 24, 2020, Plaintiff reported its claim to Defendants.

61.    By way of letter dated April 28, 2020 (copy attached as **Exhibit B**"), Defendants, through Mt. Hawley, denied Plaintiff's claim outright.

62.    Defendants have denied Plaintiff's business interruption claims arising from COVID-19, the State ordered interruption of business, and/or executive orders by civil authorities that required the suspension of business to prevent further property damage, and the duty to minimize damage to insured property imposed on Plaintiff by the Policy, by refusing to pay their insureds under the Business Income and Extra Expense coverages for losses suffered due to COVID-19.

63.    On or about September 17, 2020, a third one of Plaintiff's principals was exposed to COVID-19 in the Restaurant at a meeting with a blogger, who was there for the purpose of taking pictures for her blog to advertise for the planned September 30, 2020 reopening of the Restaurant. The blogger was infected with COVID-19 at the time of the September 17, 2020 meeting.

64.    The Restaurant did in fact re-open on September 30th, 2020, although sales upon the reopening were drastically reduced from pre-COVID levels.

65.    As a result, Plaintiff brings this action against MT. HAWLEY and LLOYD'S for failure to honor their obligations under the commercial business property policy issued to Plaintiff which provides coverage for losses of the type alleged herein.

66.    Upon information and belief, MT. HAWLEY has, on a widescale and uniform basis, refused to honor its obligations to business owners with virtually identical insurance coverage, similarly situated as Plaintiff under circumstances as alleged herein-above.

## PANDEMIC OUTBREAK AND GOVERNMENT RESPONSES

67.    Coronavirus disease 2019 ("COVID-19" or "Novel Coronavirus") is a contagious respiratory and vascular disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). First identified in Wuhan, China, it has caused an ongoing pandemic which spread to the United States.

68.    The outbreak was declared a Public Health Emergency of International Concern in January 2020 and a pandemic in March 2020. As of November 9, 2020, more than 50.7 million cases have been confirmed worldwide, with more than 1.26 million deaths attributed to COVID-19, and more than 32.8 million of those infected have recovered.

69.    COVID-19 is physically transmitted by air and by contact with surfaces through droplets, aerosols and fomites that remain infectious for extended periods of time.

70.    On March 9, 2020, Florida Governor Ron DeSantis issued Executive Order Number 20-52, declaring "a state of emergency for the entire State of Florida as a result of COVID-19" (the "March 9, 2020 Order").  A copy of the March 9, 2020 Order is attached hereto as **Exhibit "C."**

71.     On March 17, 2020, Florida Governor Ron DeSantis issued Executive Order Number 20-68 (the "March 17, 2020 Order"), ordering: (1) restaurants authorized to sell alcoholic beverages for consumption on premises that derive more than 50% of their gross revenue from the sale of alcoholic beverages to suspend all sale of alcoholic beverages for thirty days, effective at 5 p.m. on March 17, 2020, (2) all restaurants to immediately limit occupancy to 50%, and (3) all restaurants to follow CDC guidance by ensuring, at a minimum, a 6-foot distance between any group of patrons and limiting parties to no more than 10 individuals. A copy of the March 17, 2020 Order is attached hereto as **Exhibit "D."**

72.     The March 17, 2020 Order also required restaurants to implement employee screening and prohibit any employee from entering the restaurant premises if they meet any of the criteria listed below:

1) Any person infected with COVID-19 who has not had two consecutive negative test results separated by 24 hours;
2) Any person showing, presenting signs or symptoms of, or disclosing the presence of a respiratory infection, including cough, fever, shortness of breath or sore throat;
3) Any person who has been in contact with any person(s) known to be infected with COVID-19, who has not yet tested negative for COVID-19 within the past 14 days;
4) Any person who traveled through any airport within the past 14 days; or
5) Any person who traveled on a cruise ship within the past 14 days.

(the "Employee Screening Protocol").

73.     The Employee Screening Protocol added to the cost of Plaintiff's business.

74.     On March 20, 2020, Florida Governor Ron DeSantis issued Executive Order Number 20-71 (the "March 20, 2020 Order"), ordering: (1) all vendors licensed to sell alcoholic beverages for consumption on premises to suspend the sale of any alcoholic beverages for on premises consumption, and (2) all restaurants and food establishments licensed under Chapters

15

500 and 509, Florida Statues, within the State of Florida to suspend on-premises food consumption for customers. A copy of the March 20, 2020 Order is attached hereto as **Exhibit "E."**

75.     The Restaurant is located on the third floor of the building located at the corners of Lincoln Road and Meridian Avenue in Miami Beach, Florida ("Building").

76.     Plaintiff was deprived of the right to invite patrons into the Restaurant to purchase drinks at the bar by the March 17, 2020 Order.

77.     Access by patrons to the bar in the Restaurant was prohibited by the March 17, 2020 Order.

78.     Plaintiff was deprived of the right to invite 50% of the patrons into the Restaurant that it would otherwise have received at the Restaurant by the March 17, 2020 Order.

79.     Access by 50% of the patrons into the Restaurant that would otherwise have been received at the Restaurant absent the presence of COVID-19 was prohibited by the March 17, 2020 Order.

80.     COVID-19 was physically present at the Restaurant/insured premises.

81.     Plaintiff sustained direct physical loss at the insured property by the physical presence of COVID-19 on surfaces and in the air.

82.     The actual presence of COVID-19, the omnipresence of the pandemic, and governmental orders requiring closure, each reasonably qualify as a "direct" cause of loss or damage in this context, as they are neither remote nor incidental to the loss or damage sustained by Plaintiff.

83.     Customers could not and cannot access the Plaintiff's insured property due to the Governor's orders and/or fear of being infected with or spreading COVID-19.

84.     Plaintiff lost the use of all or a portion of the Restaurant by virtue of the Governor's orders and/or potential customers' avoidance of becoming infected with or spreading COVID-19.

85.     The Policy does not contain an exclusion for viruses or pandemics, even though policies written by other carriers at the time the Policy was purchased did contain such exclusions.

86.     The March 17, 2020 Order required Mila's bar to cease operations. That constituted an immediate decrease in Plaintiff's revenue that persisted until the Restaurant re-opened on September 30, 2020, and Plaintiff's operations are still affected by the Governor's orders and the presence of COVID-19a.

87.     That same order required Restaurants to immediately limit occupancy to 50%. That constituted an immediate decrease in Plaintiff's revenue that persisted until the Restaurant re-opened on September 30, 2020, and Plaintiff's operations are still affected by the Governor's orders and the presence of COVID-19.

88.     The March 20, 2020 Order required all restaurants in Florida to *completely* suspend on-premises food consumption. That order, therefore, required restaurants to immediately cease in-house dining. That constituted an additional decrease in Plaintiff's revenue that persisted until the Restaurant re-opened on September 30, 2020, and Plaintiff's operations are still affected by the Governor's orders and the presence of COVID-19.

89.     In the March 17, 2020 Order, the Governor also decreed that "[E]mployees, janitorial personnel, contractors and delivery personnel shall be allowed access to such establishments for the purpose of delivery or take-out services," connoting that access to such establishments by others, including those necessary for facilitating in-person dining, including patrons, was thereby prohibited.

90.     Prohibiting access to the insured premises by employees necessary to generate revenue from in-person dining at the establishment constitutes a "direct physical loss of … property at" the insured premises.

91.     The presence of COVID-19 at the insured premises causes and constitutes property damage, coverage for which is provided in the Policy.

92.     The following are but four instances of where government orders officially recognized the fact that COVID-19 causes physical damage to property:

a.  Broward County Emergency Order 20-03 dated March 26, 2020, contained the following clause:

WHEREAS, this Emergency Order is necessary because of the propensity of the virus to spread person to person and also because the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time.

b.  Panama City Resolution No. 20200318.1 dated March 18, 2020, contained the following clause:

This resolution is necessary because of the propensity of the virus to spread person to person and also because the virus physically is causing property  damage due to its proclivity to attach to surfaces for prolonged periods of time.

c.  Colorado Executive Order D 2020 032 dated April 8, 2020, states:

that "COVID-19… physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time."

d.  City of New York Emergency Executive Order No. 100 dated March 16, 2020, states:

"Whereas, this order is given because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage…"

93.     It is likely that customers, employees other than those already noted herein-above, and/or other visitors to the Restaurant were infected with COVID-19 before and after March 17, 2020.

94.     Plaintiff suspended operations due to COVID-19 to prevent physical damage to the insured premises caused by the presence or proliferation of the virus and the physical harm it could cause property and persons present there.

95.     The coronavirus is physical, and the insured property that became useless or uninhabitable is physical in nature. Accordingly, the presence of COVID-19, the omnipresence of the pandemic, and/or the governmental orders requiring closure rendered the insured property uninhabitable and/or unusable, and/or reduced the utility of the insured property, constituting direct physical loss of property.

96.     As a result of the presence of COVID-19 at the Restaurant, and the Florida Governor's closure orders, Plaintiff sustained a suspension of its business operations, sustained losses of business income, and incurred extra expenses.

97.     If Mt. Hawley and Lloyd's had intended to exclude pandemic-related losses under the policy, as many other insurers have done, they could easily have included an express exclusion. Instead, Defendants waited until after they collected premiums from Plaintiff, and after a pandemic and the resulting closure orders caused catastrophic business losses to Plaintiffs, to try to limit their exposure.

98.     At the time the subject insurance was purchased, Plaintiff reasonably interpreted and understood the language of the all risks insurance policy at issue in this action to provide coverage in the event of losses caused by a pandemic.

99.     At the time the subject insurance was purchased, Plaintiff intended to purchase an insurance policy that would provide coverage of its brand new restaurant, including millions of dollars of investment, in the event of losses caused by a pandemic.

100.    Plaintiff has suffered substantial losses of business income due to the shutdown, and submitted a claim for its losses to Defendants under the business-income and extra-expense provisions of the Policy.

101.    Despite the denial of coverage issued to Plaintiff by Defendants, Plaintiff in fact sustained direct physical loss of and damage to covered property, its business premises, because the Governor of Florida issued orders that shut its business down. There was a direct physical loss of Plaintiff's business premises because its business premises were rendered physically unusable for their intended purposes. The loss was direct because the  orders were expressly directed to categories of businesses to which Plaintiffs' business belongs, and because the orders were the direct cause of Plaintiffs' loss of the use of their business premises.

102.    The denial letter also relied on the exclusion for the enforcement of any ordinance or law regulating the use of any insured property. But when this exclusion is read in its entirety, it only applies to actual or proposed construction, repair, or demolition work, or work of that nature. Moreover, the complete shutdown order of the Governor did not "regulate" the use of Plaintiffs' property – it prohibited its use for its intended purpose. Finally, the ordinance or law exclusion only applies to building codes and the like.

103.    Mt. Hawley also relied on the Absolute Pollution Exclusion with respect to its denial of Plaintiff's claim. Although the term "pollutants" is ostensibly defined to include virus, the exclusion by its terms only applies to a release of pollutants that is connected in some manner

20

to the insured, to a release from a waste facility, or to a governmental direction or request that the insured remediate pollutants. That is not the case here.

104.     In addition, the first sentence of the Absolute Pollution Exclusion states that it replaces existing exclusions "regarding pollution liability." Therefore, the exclusion by its own terms only applies to liability insurance, not to business-property and business-income insurance.

105.     The denial of Plaintiffs' claims was also based on the loss-of-use aspect of the Policy's "[d]elay, loss of use or loss of market" exclusion. But this entire provision excludes lost business income. It was probably originally intended to exclude consequential damages under a business property insurance policy, but when applied to a business income insurance policy, it nullifies the precise reason for buying the coverage and thus is unenforceable and illusory.

106.     On information and belief, Mt. Hawley and Lloyd's have uniformly denied their insureds' claims which arise out of the COVID-19 pandemic under its policies' business-income, extra expense and civil authority coverages, and routinely state that there is no coverage because there was no direct physical loss of or damage to covered property.

## CLASS ACTION ALLEGATIONS

107.     This action is brought as a Plaintiff's class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). Plaintiff brings this action on its own behalf, and on behalf of all others in the State of Florida similarly situated, as representatives of the following Class:

> All businesses in the State of Florida that were issued insurance policies by Mt. Hawley and/or Lloyd's with Building and Personal Property Coverage Form CP-0010(06/07) or CP 0010(10-12), Business Income (and Extra Expense) Coverage Form CP-0030(06/07) or Business Income with Extra Expense Coverage Form CP 0030(10-12), and Causes of Loss-Special Form CP-1030(06/07) or CP

1030(10-12), whose policies were in effect on and after March 17, 2020, which businesses had their on-premises business operations shut down to the public or restricted by the Florida Governor's Orders of March 17, 2020 and March 20, 2020, who filed claims after that date under the policies' business-income and extra-expense coverage forms, and whose claims were denied by Mt. Hawley because there was allegedly no coverage under the policies.

108.    Excluded from the Class are all businesses whose policies have an endorsement specifically excluding coverage for loss or damage caused by, resulting from, or relating to a "virus."

109.    Further excluded from the Class are (1) the officers, directors, and employees of Mt. Hawley and/or Lloyd's, and their affiliated entities; and (2) all judicial officers of the United States who preside over or hear this case, and all persons related to them as specified in 28 U.S.C. § 455(b)(5).

110.    The members of the Class are readily identifiable from Defendants' computerized records.

111.    Upon information and belief, the Class consists of hundreds and possibly thousands of members, and is therefore so numerous that individual joinder of all members is impracticable. The members of the Class are geographically dispersed throughout the State of Florida.

112.    There are questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class.  The questions common to the Class include, but are not limited to, the following:

(a)    Do the policies' business-income, extra-expense and civil authority coverage forms cover losses ultimately caused by or arising from

COVID-19?

(b) Do the policies' business-income, extra-expense and civil authority coverage forms cover losses directly caused by the orders of the governmental authorities that shut down or restricted access to the Class members' businesses?

(c) Is it a breach of Defendants' contractual obligations under the Policy for them to deny the Class members' claims under the business-income, extra-expense and civil authority coverage forms, for lack of coverage under the policies?

(d) What is the meaning of the Policy provision "direct physical loss of or damage to" covered property?

(e) What fact situations do the Policy's "ordinance or law" exclusion apply to?

(f) What fact situations do the Policy's "loss of use" exclusion apply to?

(g) What fact situations do the Policy's "acts or decisions" exclusion apply to?

113.    Plaintiff's claims are typical of those of the Class and are based on the same legal theories as those of the members of the Class. Plaintiff's claims and those of the Class members all arise from the same pattern or practice by Defendants, as set out above.

114.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel who are competent in class-action litigation and/or other complex litigation, and who are knowledgeable regarding the applicable law. Plaintiff and its counsel intend to prosecute this action vigorously. Neither Plaintiff nor its counsel have any

interests that might cause them not to vigorously pursue this action. Plaintiff's interests are coextensive with those of the Class, and Plaintiff has no interests adverse to those of the Class.

115.   Plaintiff has made arrangements with its counsel for the discharge of its financial responsibility to the Class. Plaintiff's counsel has the necessary financial resources to adequately and vigorously litigate this class action.

116.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy, and it is desirable to concentrate the litigation of the claims in this forum. The damages suffered by many Class members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.   Moreover, many of the Class members are likely to be unaware of their rights. Therefore, it is unlikely that these Class members, on an individual basis, can obtain effective redress for the wrongs done to them.

117.   Additionally, the court system would be adversely affected by such individualized litigation.  Individualized litigation would create the danger of inconsistent judgments arising from the same set of facts.  Individualized litigation would also increase delay and expense to all parties and the court system from the issues raised by this action. In contrast, the class-action device provides the benefit of adjudication of these issues in a single proceeding, with economies of scale and comprehensive supervision by a single court.

118.   Plaintiff and its counsel are aware of no litigation concerning the controversy already begun by or against members of the Class. This also indicates that the Class members' interest in individually controlling the prosecution of separate actions is minimal.

119.   Plaintiff does not anticipate any likely difficulties in the management of this action as a class action.

120.     Defendants have acted in a manner generally that affects the Class, as specified above, so that corresponding declaratory relief is appropriate respecting the Class as a whole.

121.     All conditions precedent to the bringing of this action have occurred or been performed.

## COUNT I
## DECLARATORY JUDGMENT

Plaintiff alleges as follows against Defendants, on its own behalf and on behalf of the members of the Class, pursuant to Federal Rule Civil Procedure 23(b)(2) and 28 U.S.C § 2201:

122.     Plaintiff realleges the allegations set forth in paragraphs 1 through 121 above as though fully set forth herein.

123.     There is an actual, substantial, and justiciable controversy between Plaintiffs and the Class members on the one hand, and Mt. Hawley and Lloyd's on the other, regarding whether Plaintiffs and the Class members' losses of business income and any extra expenses are covered losses under the coverage forms specified above.

124.     A judgment declaring the rights of Plaintiffs and the Class members will serve a useful purpose in settling and clarifying the legal relations at issue, and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this request for a declaratory judgment.

125.     Plaintiffs and the Class members are entitled to a judgment declaring that their losses of business income and any extra expenses are covered losses under the specified coverage forms.

## COUNT II

## BREACH OF CONTRACT

Plaintiff realleges the allegations set forth in paragraphs 1 through 121 above as though fully set forth herein.

126.    There are valid contracts of insurance binding Plaintiffs and the Class members on the one hand and Mt. Hawley and Lloyd's on the other.

127.    Plaintiffs and the Class members have performed their obligations under the contracts of insurance. Plaintiffs and the Class members have filed claims with Mt. Hawley and Lloyd's for their lost business income.

128.    Mt. Hawley and Lloyd's have not performed their obligations under the insurance contracts, in that they have denied coverage for Plaintiff's and the Class members' losses of business income when those losses are covered losses under the coverage forms specified above.

129.    Plaintiffs and the Class members have been damaged by Mt. Hawley's and Lloyd's denial of coverage, in the amount of their lost business income and extra expenses.

130.    Plaintiff and the Class members are entitled to a judgment against Mt. Hawley and Lloyd's in the amount of their lost business income and any extra expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually, and on behalf of the members of the Class, asks that the Court:

(a)    Certify the Class proposed herein;

(b)    Appoint Plaintiff as representative of the Class;

(c)    Appoint Plaintiffs' counsel as attorneys for the Class;

(d)    Declare the rights of Plaintiff and the Class as follows: declare that Plaintiff's and the Class members' losses of business income and any extra expenses are covered losses under the specified coverage forms.

(e)    Enter judgment awarding Plaintiff and the Class members monetary damages for Defendants' breaches of their insurance contracts, in the amount of their lost

business income and any extra expenses;

(f)     Award Plaintiff and the Class members prejudgment interest and post-judgment interest as provided by law;

(g)     Award Plaintiff and the Class members a reasonable attorney's fee and the costs of this action; and

(h)     Provide such further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff, on behalf of itself and the members of the Class, demand a trial by jury on all issues so triable.

Date:  December 31, 2020          */s/ Kevin P. Crosby*
                                  Kevin P. Crosby, Esq.
                                  Florida Bar No. 654360
                                  Guy Bennett Rubin, Esq.
                                  Florida Bar No. 691305
                                  COVID LAW GROUP
                                  PO Box 395
                                  Stuart, Florida 34995
                                  Telephone: (772) 283-2004
                                  Facsimile: (772) 283-2009
                                  kcrosby@rubinandrubin.com
                                  grubin@rubinandrubin.com
                                  *Attorneys for Plaintiff*